UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. _____

FRED KANTROW and MARLENE KANTROW,
on their own behalves and on behalf of all other
similarly situated passengers who sailed aboard
the CELEBRITY ECLIPSE between March 1
and March 30, 2020,

     Plaintiffs,

v.                                    **CLASS ACTION**

CELEBRITY CRUISES INC.,

     Defendant.
_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, FRED KANTROW and MARLENE KANTROW, on their own behalves and

on behalf of all other similarly situated passengers who sailed aboard the CELEBRITY ECLIPSE

between March 1 and March 30, 2020 (hereinafter collectively referred to as "Plaintiffs"), hereby

sue Defendant, CELEBRITY CRUISES INC. (hereinafter "CELEBRITY"), and for good cause

allege:

## JURISDICTION AND PARTIES

1.    Plaintiffs, FRED KANTROW and MARLENE KANTROW, are residents of the State of

New York.

2.    Defendant, CELEBRITY CRUISES INC., is a foreign entity which conducts its business

from its principal place of business in Miami, Florida.

3.    The matter in controversy exceeds the required jurisdictional amount, exclusive of interest

and costs, and is a class action brought under this Honorable Court's jurisdiction pursuant to 28

U.S.C. § 1332(d)(2). In the event that class status is not certified, then this matter is brought under the admiralty and maritime jurisdiction of this Honorable Court.

4.      Defendant, CELEBRITY, at all times material, personally or through an agent:

     a.   Operated, conducted, engaged in or carried out a business venture in this state and/or county and/or had an office or agency in this state and/or county;

     b.   Was engaged in substantial business activity within this state;

     c.   Operated vessels in the waters of this state;

     d.   Committed one or more of the acts stated in Florida Statutes, Sections 48.081, 48.181 or 48.193;

     e.   The acts of Defendant set out in this Complaint occurred in whole or in part in this county and/or state; and/or

     f.   Issued a cruise line ticket to the Plaintiffs that requires that suit be brought in this Court against the named Defendant in this action.

5.      Defendant is subject to the jurisdiction of the Courts of this state.

6.      The causes of action asserted in this Complaint arise under U.S. General Maritime Law.

7.      At all times material hereto, Defendant exclusively owned, operated, managed, maintained and/or controlled the subject cruise vessel, the *Celebrity Eclipse* (hereinafter referred to as the "vessel").

8.      At all times material hereto, Defendant operated the vessel in navigable waters.

9.      The voyage upon which this Complaint is based occurred between March 1 and March 30, 2020 (hereinafter referred to as the "subject voyage").

10.     Plaintiffs, the Class Representatives and Class Members herein, were passengers aboard Defendant's vessel between March 1 and March 30, 2020 and who contracted SARS-CoV-2 (hereinafter "COVID-19") and/or were placed at a heightened risk of exposure to COVID-19 while aboard Defendant's vessel and/or as a result of Defendant's careless conduct alleged herein.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

11.     This Class Action lawsuit deals with Defendant, CELEBRITY's careless and continuous failure to reasonably protect its passengers aboard the vessel during the subject voyage from COVID-19, despite CELEBRITY knowing, before and during the subject voyage, of: i) the dangerous conditions and/or explosive contagiousness presented by a COVID-19 outbreak aboard the vessel[1] and ii) that a person(s) aboard the vessel displayed flu-like symptoms consistent with a positive COVID-19 diagnosis on or about March 2, 2020 and/or during the course of the voyage.

12.     The dangerous conditions associated with COVID-19 include its manifestations – severe pneumonia, acute respiratory distress syndrome (ARDS), septic shock and/or multi-organ failure[2] – and/or its symptoms – fever, dry cough, and/or shortness of breath[3] – as well as the high fatality rate associated with contracting the virus.[4] The dangerous conditions associated with COVID-19 also include its extreme contagiousness. For example, a person with COVID-19 infects, on average, another 2.5 people, and COVID-19 is therefore more contagious than Ebola or Influenza.[5]

---

[1] *See* Centers for Disease Control and Prevention, *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019*, (last updated February 18, 2020) https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html; and Centers for Disease Control and Prevention, *March 14, 2020 No Sail Order*, https://www.cdc.gov/quarantine/pdf/signed-manifest-order_031520.pdf   (hereinafter collectively referred to as the "Memorandums").

[2] *See* Centers for Disease Control and Prevention, *March 14, 2020 No Sail Order*, https://www.cdc.gov/quarantine/pdf/signed-manifest-order_031520.pdf.

[3] *See* Mayo Clinic, *Symptoms and Causes*, https://www.mayoclinic.org/diseases-conditions/coronavirus/symptoms-causes/syc-20479963 (last accessed April 6, 2020); *see also* Centers for Disease Control and Prevention, *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019*, (last updated February 18, 2020) https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html.

[4] *See* Centers for Disease Control and Prevention, *March 14, 2020 No Sail Order* https://www.cdc.gov/quarantine/pdf/signed-manifest-order_031520.pdf (identifying a 3.6% global fatality rate); Journal of the American Medical Association, *Case-Fatality Rate and Characteristics of Patients Dying in relation to COVID-19 in Italy*, https://jamanetwork.com/journals/jama/fullarticle/2763667 (identifying a 7.2% and 2.3% fatality rate in Italy and China, respectively).

[5] Popular Science, *COVID-19 Contagiousness*, https://www.popsci.com/story/health/how-diseases-spread/

13.     As a result of its careless conduct further detailed below, CELEBRITY negligently exposed thousands of passengers aboard the vessel during the subject voyage, including Plaintiffs herein, to COVID-19. Such harm includes, but is not limited to, these passengers suffering from lung injuries caused by COVID-19 and/or permanently reduced lung capacity, complications and/or further injury/ies caused by contracting COVID-19 in conjunction with pre-existing illness and/or medical conditions and/or death.[6]

14.     Based on information known to date, CELEBRITY first recognized the risks of COVID-19 aboard its vessels, including the subject vessel, on February 5, 2020, when CELEBRITY sent the e-mail excerpted below to all of its prospective passengers, including Plaintiffs herein for the subject voyage.

*[The remainder of this page is intentionally left blank;*
*e-mail excerpted below]*

---

[6]     *See* South China Morning Post, *Coronavirus*, https://www.scmp.com/news/hong-kong/health-environment/article/3074988/coronavirus-some-recovered-patients-may-have; Deutsche Welle, *COVID-19*, https://www.dw.com/en/covid-19-recovered-patients-have-partially-reduced-lung-function/a-52859671.

-----Original Message-----
From: Celebrity Cruises Express Notification Alerts <noreply@everbridge.net>

Sent: Wed, Feb 5, 2020 9:38 pm
Subject: Celebrity Cruises Cruise Notification

Please click here to acknowledge receipt of this message



## ABOUT YOUR UPCOMING TRAVELS

Dear Guest,

We look forward to welcoming you aboard for your upcoming Celebrity Cruises vacation.  Before you embark on this exciting journey, we would like to provide some new and updated information regarding your upcoming travel plans.

As we monitor global developments related to the coronavirus, our priority remains the health and safety of our guests and crew, as well as providing you an amazing vacation experience. After further consultation with public health authorities and medical experts, we have decided that any guest, or crewmember, who has traveled to, from, or through China, Hong Kong or Macau within 15 days of departure will be unable to board our ships. As well as coming in to contact with people who reside in these areas – this includes guests who had connecting flights in China, Hong Kong or Macau.

As a result, it is imperative that you check your air travel itinerary closely to ensure you do not transit through any gateway in China, Hong Kong or Macau. Guests who have air travel booked through Flights by Celebrity will be re-accommodated on alternate routes and receive new flight information automatically. Guests with independent air travel arrangements need to contact their air carriers directly to make all required adjustments and changes to their air travel.

L I P C O N ,   M A R G U L I E S ,   A L S I N A   &   W I N K L E M A N ,   P . A .
W W W . L I P C O N . C O M

We have elected to take this precautionary step due to the recent increase in coronavirus cases around the world, to help avoid the spread of the virus and to ensure the continued safety of our guests and crew. While vacations are our passion, our primary responsibility is to maintain a safe and healthy environment onboard our ships, as well as in the ports we visit.

We have also increased secondary health screening requirements. The following guests will need to undergo extra screenings at the cruise terminal:

- Anyone that holds a Chinese, Hong Kong or Macau passport – regardless of when they were there last.
- Anyone that feels unwell or demonstrates flu-like symptoms.

We've also taken numerous proactive steps to maintain high health standards onboard our ships:

- Thoroughly sanitizing the cruise ship terminal before and after every sailing.
- Special sanitizing of high traffic areas onboard multiple times a day.
- Adding extra medical staff on each sailing.
- Providing complimentary consultations with medical experts for all guests and crew.
- Plus, the Captain will make daily announcements during your cruise reminding everyone of how to stay healthy onboard.

Finally, you can contribute to a healthy onboard environment by taking a few simple steps that will help prevent colds, flus and stomach viruses – both onboard and on land.

- Make sure to wash your hands thoroughly with soap and warm water for at least 20 seconds after using the restroom and before any meal or snack.
- Cover your nose and mouth with a tissue (or with your upper sleeve) if you happen to sneeze. Avoid sneezing or coughing into your hands or without covering your nose and mouth.
- Use hand sanitizer as often as possible. Rub the gel thoroughly, and in-between your fingers, until your hands are dry.

If you don't feel well while onboard, it's imperative that you visit our onboard medical facility immediately for a complimentary checkup. Our onboard doctors and nurses are always available and ready to assist.

If you or someone in your stateroom has traveled to, from, or through, mainland China, Hong Kong or Macau, please contact your Travel Advisor immediately, or contact us at 1-844-418-6824 in North America or (316) 554-5961 worldwide. You can also visit www.celebritycruises.com/contact-us for a complete list of global contact information.

We look forward to welcoming you aboard for a truly incredible vacation.

Sincerely,

**Celebrity Cruises**

©2017 Celebrity Cruises. Ships' Registry: Malta

Celebrity Cruises
1050 Caribbean Way
Miami, FL 33132
1-800-280-3423

15.     Further, despite Defendant acquiring knowledge on or about March 2, 2020 that a person(s) aboard the vessel displayed symptoms consistent with a positive COVID-19 diagnosis, Defendant did not thereafter – <u>or at any time during the subject voyage</u> – enact quarantine and/or physical distancing measures amongst passengers and/or crew members aboard the vessel.

16.     Instead, in an alarming lack of caution, Defendant continued to operate the vessel as normal, allowing a "full schedule of entertainment, activities and dining options" aboard the vessel. *See* <u>Capt. Palaiokrassas' March 17 and 28, 2020 letters to *Celebrity Eclipse* passengers</u>, excerpted herein below. In other words, despite having knowledge that a COVID-19 outbreak was occurring aboard the vessel, CELEBRITY continued to allow passengers to eat in buffets settings, provide group entertainment activities aboard the vessel (such as dancing) and otherwise allow passengers to fully participate in the subject cruise as if there was no COVID-19 or threat thereof aboard the vessel.

17.     In addition, CELEBRITY actively attempted to pacify passengers in the midst of the COVID-19 outbreak aboard the vessel by offering them complimentary alcoholic beverages and otherwise downplaying the severity of the COVID-19 outbreak that was ravaging the vessel, its passengers and crew during the subject voyage, such as by lying to passengers that even as late as March 28, 2020, "[a]ll guests onboard remain healthy and happy". *See id.*

18.     For example, on March 21, 2020, CELEBRITY shipboard management personnel held a gathering of passengers and crew members aboard the vessel to recognize the heroics of medical professionals and first responders in response to the COVID-19 pandemic. As evidenced by the pictures of this event provided below and herein, CELEBRITY did not enforce any physical distancing measures during the event.



*Picture of March 21, 2020 event aboard the* Celebrity Eclipse *wherein passengers and crew members gathered in close proximity to one another to recognize the heroics of medical professionals and first responders during the COVID-19 pandemic.*

19.     In sum, despite knowing that COVID-19 was and/or likely was present aboard the vessel during the subject voyage, CELEBRITY glaringly failed to follow even the most basic safety precautions after acquiring such notice, such as reasonably warning passengers of the potential presence of COVID-19 aboard the vessel, timely quarantining passengers and crew members aboard the vessel, timely providing passengers and crew members masks and/or timely requiring them to observe physical distancing measures.

20.     CELEBRITY's egregious failure to protect its passengers from the COVID-19 outbreak aboard the vessel has already resulted in at least 45 passengers and crew who tested positive COVID-19, and at least two COVID-19 related deaths. There are likely hundreds more positive COVID-19 cases and/or deaths related to the subject voyage given that there was limited and/or non-existent testing performed aboard the vessel and immediately thereafter when passengers disembarked the vessel without proper screening before returning to their home states/countries.

## Background on the worldwide spread of COVID-19

21.     Since December 2019, there has been a worldwide outbreak of COVID-19, which is now considered a pandemic. The virus originated in China, and quickly spread throughout Asia, Europe, and most recently, North America.

22.     There have been over four million confirmed cases and over two hundred thousand deaths worldwide as a result of the COVID-19 pandemic.

23.     On or about February 13, 2020, the Center for Disease Control (hereinafter the "CDC") published the *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019*, which provided guidance for ship operators, including cruise ship operators, to help prevent, detect, and medically manage suspected COVID-19 infections aboard ships, like the vessel named herein. *See* the Memorandum cited at footnote 1.

24.     In view of the fact that Defendant, CELEBRITY, has its principal place of business in Miami, Florida, and operates numerous cruise vessels which originate from and/or stop at ports within the U.S., as early as February 13, 2020, Defendant, CELEBRITY, knew and/or should have been aware of this Memorandum, including, but not limited to, the dangerous conditions and/or explosive contagiousness associated with COVID-19 and its likely presence aboard Defendant's vessel at the commencement of the subject voyage.

25.      This Memorandum provided cruise vessel operators, like CELEBRITY, with numerous helpful considerations to assist in detecting and preventing the spread of COVID-19 amongst its crew members, passengers and its vessels at large, some of which include:

- "Early detection, prevention, and control of Coronavirus Disease 2019 (COVID-19) on ships **is important** to protect the health of travelers on ships and to avoid transmission of the virus by disembarking passengers and crew members who are suspected of having COVID-19";

- "Identifying and isolating passengers and crew with possible symptoms of

Lipcon,  Margulies,  Alsina  &  Winkleman,  P.A.
www.lipcon.com

COVID-19 as soon as possible **is needed** to minimize transmission of this virus";

- "To reduce spread of respiratory infections including COVID-19, CDC **recommends** that ships encourage crew members and passengers to

    - Postpone travel when sick

    - Watch their health

    - Self-isolate and inform the onboard medical center immediately if they develop a fever (100.4ºF / 38ºC or higher), begin to feel feverish, or develop other signs or symptoms of sickness

    - Use respiratory, cough, and hand hygiene

        - Advise passengers and crew of the importance of covering coughs and sneezes with a tissue. Dispose used tissues immediately in a disposable container (e.g., plastic bag) or a washable trash can.

        - Remind passengers and crew members to wash their hands often with soap and water, especially after coughing or sneezing. If soap and water are not available, they can use a hand sanitizer containing 60%-95% alcohol)"

- "**Deny boarding of a passenger or crew member** who is suspected to have COVID-19 infection based on signs and symptoms plus travel history in China or other known exposure at the time of embarkation";

- "Passengers and crew members who have had high-risk exposures to a person suspected of having COVID-19 **should be** quarantined in their cabins. All potentially exposed passengers, cruise ship medical staff, and crew members **should** self-monitor under supervision of ship medical staff or telemedicine providers until 14 days after the last possible exposure";

- "**Isolate passengers or crew onboard** who are suspected of having COVID-19 infection in a single-occupancy cabin with the door closed until symptoms are improved."

*See* Centers for Disease Control and Prevention, *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019*, (last updated February 18, 2020) https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html.

26.    Moreover, Defendant, CELEBRITY, and the cruise industry at large, received an early,

dire warning of how easily COVID-19 could spread on massive ocean liners when the first cases

emerged aboard the *Diamond Princess*, a vessel owned by Princess Cruise Lines ("Princess"), which is owned by Carnival Corporation, in early February 2020 in Yokohama Harbor, Japan. The outbreak began with ten confirmed COVID-19 cases, which rapidly multiplied to seven hundred confirmed cases, as a result of Princess' flawed two-week quarantine of passengers and crew members aboard the *Diamond Princess*.

27.     As a result of the *Diamond Princess* crisis, and on February 18, 2020, the CDC issued a statement providing that: "the rate of new reports of positives new on board [the *Diamond Princess*], especially among those without symptoms, **highlights the high burden of infection on the ship and potential for ongoing risk**."[7] Seven of the *Diamond Princess*' passengers ultimately died as a result of COVID-19 exposure aboard the vessel.

28.     The cruise industry received yet another ominous warning of how quickly and severely COVID-19 could spread on cruise ships when the *Grand Princess*, another vessel owned by Princess, also owned by Carnival Corporation, had a breakout in late February 2020 off the coast of California. Princess had knowledge that at least one of its passengers from a prior voyage who disembarked the *Grand Princess* on February 21, 2020 had symptoms of COVID-19, and yet, it made the conscious decision to proceed with the subsequent voyage aboard the *Grand Princess* that began on February 21, 2020 with another three thousand passengers on an infected ship.

29.     Prior to boarding the February 21, 2020 voyage on the *Grand Princess*, passengers were simply asked to fill out a piece of paper confirming they were not sick. Not one passenger was questioned, let alone examined, in any capacity. As a result of Princess' lackadaisical approach to the safety of passengers and crew, 103 passengers eventually tested positive for COVID-19 and two people have so far died.

---

[7]     Centers for Disease Control, *Update on the* Diamond Princess *Cruise Ship in Japan*, https://www.cdc.gov/media/releases/2020/s0218-update-diamond-princess.html (emphasis added).

30.     Additionally, on or about March 7, 2020, Vice President Mike Pence met with top cruise industry executives (including the CEOs of Carnival, Royal Caribbean and Norwegian cruise lines), in order to address the impact of COVID-19 on the cruise industry, specifically. The next day, March 8, 2020, the U.S. Department of State, in conjunction with the CDC, set forth a recommendation **that U.S. citizens should not travel by cruise ship given the CDC's findings which support the "increased risk of infection of COVID-19 in a cruise ship environment**."[8]

31.     Relatedly, on or about March 14, 2020, the CDC issued its first No Sail Order.[9] The No Sail Order is/was applicable to cruise ship operators, like Defendant herein, and provided science updates known to that date pertaining to the explosive contagiousness associated with COVID-19 and how the virus presented dangerous conditions to passengers and crew members aboard cruise ships, like the vessel named herein. For example, the CDC's first No Sail Order stated the following:

- "**Like other close-contact environments, cruise ships facilitate transmission of COVID-19**."

- "There are several features of cruise ships that increase the risk of COVID-19 transmission."

- "A hallmark of cruise travel is the number and variety of person-to-person contacts an individual passenger may have daily."

- "**The dynamics of passenger-to-passenger, passenger-to-crew, crew-to-passenger, and crew-to-crew intermingling in a semi-closed setting are particularly conducive to SARS-CoV-2 spread, resulting in high transmission rates**."

- "**Cruises include frequent events that bring passengers and crew close**

---

[8]   *See* U.S. Dept. of State, March 8, 2020 *No Sail On Cruise Ships Recommendation* https://travel.state.gov/content/travel/en/international-travel/before-you-go/travelers-with-special-considerations/cruise-ship-passengers.html?fbclid=IwAR23mRlu4-382HLuSM8i0KWQBSaZ4heDniggmxR3kBR6e2EgWiKr6B0EseM.

[9]   *See* Centers for Disease Control and Prevention, *March 14, 2020 No Sail Order* https://www.cdc.gov/quarantine/pdf/signed-manifest-order_031520.pdf.

together, including group and buffet dining, entertainment events, and
excursions. Cruise ship cabins are small, increasing the risk of transmission
between cabinmates."

- "Close quartering is a particular concern for crew, who typically eat and sleep in
  small, crowded spaces."

- "Infection among crew members may lead to transmission on sequential
  cruises on the same vessel because crew members may continue working and
  living onboard the ship from one cruise to the next."

- "Crew from one ship may in turn serve onboard multiple different ships for
  subsequent voyages, which also has the potential to amplify transmission."

*See* Centers for Disease Control and Prevention, *March 14, 2020 No Sail Order*
https://www.cdc.gov/quarantine/pdf/signed-manifest-order_031520.pdf (emphasis added).

32.     Outlined below is a timeline of events relevant to this Class Action lawsuit against

CELEBRITY. This timeline supports all claims asserted herein on behalf of the entire class. More

specifically, this timeline supports CELEBRITY having actual knowledge of the dangerous

conditions and/or explosive contagiousness associated with COVID-19 aboard the subject vessel

at the same time CELEBRITY dangerously and continuously exposed its passengers, the Class

Member Plaintiffs herein, to the deadly COVID-19 – which has already resulted in the deaths of

at least two CELEBRITY passengers and has injured approximately 45 other passengers and crew

who contracted COVID-19 aboard the vessel and/or as a result of Defendant's careless response

thereto:

a.  December 31, 2019 – The local government in Wuhan, China, confirmed with the
    World Health Organization (hereinafter "WHO") that local health authorities in
    Wuhan were treating an influx of dozens of patients with what appeared to be novel
    cases of pneumonia with an unknown cause.

b.  January 5-7, 2020 – China announced that the novel pneumonia cases in Wuhan
    were not caused by severe acute respiratory syndrome (hereinafter "SARS") or
    middle-east respiratory syndrome (hereinafter "MERS") – but COVID-19 – which
    belongs to the highly-contagious family of coronaviruses, including SARS and
    MERS.

c. <u>January 11, 2020</u> – The Wuhan Municipal Health Commission announced the first death caused by COVID-19.

d. <u>January 20, 2020</u> – A situation report published by the WHO confirmed COVID-19 cases outside of mainland China in Thailand, Japan and South Korea, which the WHO believed to have been exported from Wuhan, China. The situation report also identified 282 positive COVID-19 diagnoses worldwide with 278 of those positive cases within China.

e. <u>January 21, 2020</u> – A man in Washington State, U.S.A., became the first known person diagnosed with COVID-19 in the U.S.A.

f. <u>January 23, 2020</u> – Chinese authorities take the <u>unprecedented</u> measure of closing off Wuhan – a city of over 11,000,000 people – to stop the spread of COVID-19.

g. <u>January 30, 2020</u> – WHO declared COVID-19 a "global health emergency" – recognizing that COVID-19 posed a risk beyond China. The U.S. Department of State issued a Level 4 (highest level) travel advisory as it related to U.S. citizens who planned to travel to China.

h. <u>February 2, 2020</u> – China reports that the death toll from COVID-19 in mainland China (361) exceeded the death toll in mainland China from the SARS outbreak in the early 2000s (349).

i. <u>February 5, 2020</u> – Chinese officials announced that nearly 500 people in mainland China have died as a result of COVID-19.

j. <u>February 5, 2020</u> – CELEBRITY sends e-mail (excerpted above) recognizing the risks of COVID-19 aboard its vessels to all prospective passengers.

k. <u>February 5, 2020 (*Diamond Princess*)</u> – Passengers aboard the *Diamond Princess* near Yokohama, Japan began a two-week quarantine after nine (9) passengers and one (1) crew member tested positive for COVID-19 while aboard the vessel.

l. <u>On or about February 13, 2020</u> – The CDC published the Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019, which provided guidance for ship operators, including cruise ship operators, to help prevent, detect, and medically manage suspected COVID-19 infections.[10]

m. <u>February 21, 2020 (*Grand Princess*)</u> – The *Grand Princess* embarked on a voyage despite its cruise operator, Princess, having knowledge that at least one of its passengers from a prior voyage who disembarked the *Grand Princess* on February

---

[10] *See* Centers for Disease Control and Prevention, *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019*, (last updated February 18, 2020) https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html.

21, 2020 had symptoms of COVID-19 while aboard the vessel.

n.   <u>February 19-25, 2020 (*Diamond Princess*)</u> – Following the two-week quarantine aboard the *Diamond Princess*, Japanese officials announced that of the 3,711 passengers aboard the vessel, over 700 tested positive for COVID-19 (**18.8%**) – the largest cluster of positive COVID-19 cases outside of mainland China at that time.

o.   <u>On or about February 29, 2020 (*Majesty of the Seas*)</u> – A passenger(s) aboard the *Majesty of the Seas*, a vessel operated by Royal Caribbean Cruises Ltd., CELEBRITY's parent company, developed symptoms consistent with a positive COVID-19 diagnosis and upon information and belief presented their symptoms to the ship's medical center; that same passenger(s) later tested positive for COVID-19.[11]

p.   <u>March 1, 2020 (*Celebrity Eclipse*)</u> – While on land and before allowing passengers to board the vessel therefrom, CELEBRITY (and/or its agents) failed to adequately screen passengers for known and/or objective COVID-19 symptoms (*i.e.* fever, dry cough, shortness of breath, etc.). Further, despite CELEBRITY having knowledge of the perilous situations aboard the *Grand Princess* and *Diamond Princess* in connection with COVID-19 outbreaks aboard those vessels, CELEBRITY and/or the *Celebrity Eclipse* shoreside management personnel made the decision to set sail on the vessel with passengers aboard; instead of canceling the voyage given the likelihood of a COVID-19 outbreak aboard the *Celebrity Eclipse* and in view of the outbreak across several metropolitan cities worldwide at that time. Thereafter, the *Celebrity Eclipse* debarked from Argentina for a fourteen (14) night Argentinian and Chilean cruise with approximately 2,500 passengers and 750 crew members onboard.

q.   <u>On or about March 2, 2020 (*Celebrity Eclipse*)</u> – A passenger (or passengers) aboard the *Celebrity Eclipse* complained of flu-like symptoms consistent with a COVID-19 diagnosis.[12]

r.   <u>On or about March 8, 2020 (*Oasis of the Seas*)</u> – A passenger(s) aboard the *Oasis of the Seas*, a vessel operated by Royal Caribbean Cruises Ltd., CELEBRITY's parent company, developed symptoms consistent with a positive COVID-19 diagnosis and upon information and belief presented their symptoms to the ship's medical center; that same passenger(s) later tested positive for COVID-19.[13]

---

[11] *See* Centers for Disease Control and Prevention, *CDC's role in helping cruise ship travelers during the COVID-19 pandemic* https://www.cdc.gov/coronavirus/2019-ncov/travelers/cruise-ship/what-cdc-is-doing.html.

[12] *See* Centers for Disease Control and Prevention, *CDC's role in helping cruise ship travelers during the COVID-19 pandemic* https://www.cdc.gov/coronavirus/2019-ncov/travelers/cruise-ship/what-cdc-is-doing.html.

[13] *See* Centers for Disease Control and Prevention, *CDC's role in helping cruise ship travelers during the COVID-19 pandemic* https://www.cdc.gov/coronavirus/2019-ncov/travelers/cruise-ship/what-cdc-is-doing.html.

s.  March 9, 2020 (*Grand Princess*) – The *Grand Princess* docked in Oakland, California and its passengers were held in quarantine. Of the 3,553 passengers onboard, 21 of the 46 first round of passengers tested for COVID-19 tested positive (**45%**). Many passengers ultimately refused COVID-19 testing so that they could disembark and travel to the safety of their homes quicker.

t.  March 13, 2020 – RCCL suspended all of its future cruises, including those associated with its subsidiary companies, including CELEBRITY.

u.  March 14, 2020 – The CDC issued its first No Sail Order. The No Sail Order is/was applicable to cruise ship operators, like Defendant herein, and provided science updates known to date pertaining to the explosive contagiousness associated with COVID-19 and how the virus presented dangerous conditions to passengers and crew members aboard cruise ships, like the vessel named herein.[14]

v.  March 15, 2020 (*Celebrity Eclipse*) – The *Celebrity Eclipse* is denied the ability to dock in Chile because of the country's concerns with passengers and crew aboard who may have COVID-19. Following this development, CELEBRITY does not enact quarantine and/or physical distancing measures aboard the vessel, but instead, allows passengers aboard the vessel to enjoy the voyage as normal.

w.  March 17, 2020 (*Celebrity Eclipse*) – Capt. Leonardos Palaiokrassas, Captain of the *Celebrity Eclipse* during the subject voyage, issued a letter to all passengers aboard the vessel stating that due to the vessel being denied port entry to discharge all passengers in San Antonio, Chile (as originally intended), the vessel would set sail to San Diego in order to disembark remaining passengers, estimated time of arrival, March 27, 2020, and in the meantime, CELEBRITY would continue to offer a "**full schedule of entertainment, activities and dining options**" to passengers aboard the vessel. At this same time, CELEBRITY actively attempted to pacify passengers from the thought and/or dangers of COVID-19 aboard the vessel – despite acknowledging the "**escalation of this unprecedented situation**" – by offering them complimentary alcoholic beverages and otherwise downplaying the severity of the COVID-19 outbreak that was ravaging the vessel, its passengers and crew during that time. *A copy of Capt. Leonardos Palaiokrassas' March 17, 2020 letter is provided below.*

---

[14] *See* Centers for Disease Control and Prevention, *March 14, 2020 No Sail Order* https://www.cdc.gov/quarantine/pdf/signed-manifest-order_031520.pdf.



March 17, 2020

Dear Valued Guests,

We hope that you've been enjoying your time on Celebrity Eclipse®. At this time, we would like to provide an update on the status of our debarkation and itinerary.

The Port of San Antonio has made a final decision to deny our entry to port. While we do not agree with this decision and are frustrated by the outcome, we have worked to develop an alternative itinerary that provides a secure and predictable return journey for all those onboard. We will now set sail to the Port of Valparaiso, about 90 kilometers away, 4 hours by sea. Valparaiso has given us permission to arrive tomorrow morning, where we will remain at anchor to complete refueling and receive provisions. We expect this process to take at least twenty-four hours, as all supplies will need to be brought to us by barge from shore.

Chile will not provide us with clearance to debark guests in Valparaiso, with the exception of any Chilean Citizens who will be given the opportunity to return home. No other guests will be permitted to leave the ship while we remain at anchor. The debarkation process for our Chilean guests will start tomorrow morning and we will be contacting these guests individually with further information on the overall arrival process.

After we have completed provisioning and any debarkation, Celebrity Eclipse will set sail for San Diego, California, where we have secured clearance from all relevant authorities and where there is substantial international and domestic airlift to assist with your journey home. After we sail from Chile it will take approximately 10 days to arrive in San Diego.

We understand and share your frustration with the uncertainty during the escalation of this unprecedented situation. Our leadership teams both onboard, and in Miami are disappointed that we were unable to secure a timelier debarkation but will now set our sights on undertaking a safe, happy and, most importantly, healthy journey home for all of us.

Our Flights by Celebrity team is actively working on securing flights for all remaining guests onboard and will finalize return travel arrangements for everyone, now that our final port is secure.

Throughout the remainder of our journey we will continue to provide you with a full schedule of entertainment, activities and dining options. Wi-Fi will remain complimentary, as will beverage service throughout the ship. Our Officers and Crew will be available for any assistance you may need. All guests onboard remain healthy and happy, and we will do everything we can to keep it that way on the remainder of our journey home.

We thank you for your continued patience and understanding during this very fluid situation. Once we complete refueling and provisioning in Valparaiso, we will set the course for San Diego were we are pleased to have secure proper clearances, with a plan in place to get you all home safely. We will update you on our final arrival time to San Diego once we leave from Valparaiso. And we will continue to do all possible to ensure you have a safe and comfortable journey home.

Sincerely,

Captain Leonardos Palaiokrassas
Master
Celebrity Eclipse

x.  <u>March 21, 2020 (*Celebrity Eclipse*)</u> – CELEBRITY's shipboard management personnel held a gathering of passengers and crew members aboard the vessel to recognize the heroics of medical professionals and first responders in response to the COVID-19 pandemic. As evidenced by the pictures of this event provided below, CELEBRITY did not enforce any physical distancing measures during the event.







y.  <u>March 26, 2020</u> (*Celebrity Eclipse*) – A passenger(s) aboard the vessel visits the ship's infirmary and complained of symptoms consistent with a positive COVID-19 diagnosis.[15]

z.  <u>March 28, 2020</u> (*Celebrity Eclipse*) – Capt. Palaiokrassas issued another letter to passengers recognizing the need to maintain physical distancing measures *off the vessel*, but not enacting physical distancing measures *aboard the vessel*. Despite these concerns, CELEBRITY would continue to offer a "**full schedule of entertainment, activities and dining options**" to passengers aboard the vessel.



March 28, 2020

Dear Valued Guest,

We hope that you've been enjoying your time on Celebrity Eclipse®. At this time, we would like to provide an update on the status of our debarkation and itinerary.

We are pleased to advise that our plan for debarkation in San Diego has been finalized.  Celebrity Eclipse is now scheduled to arrive in San Diego, California on Monday morning, March 30th.  As soon as we receive final CBP clearance and confirmation of all flights we will start the process of debarkation.

At that time, we will follow a very controlled debarkation procedure with guests who have the earliest flights departing first.  All guests will debark directly to our prearranged transfer buses.  It is important that you keep anything needed during your journey, such as medications, in your carry-on bag. The buses will then take you directly to San Diego and LAX International Airport, depending on your flight arrangement.

A Hospitality Desk will be set up at the San Diego airport to provide any assistance needed. The Hospitality Desk will be located on the Skybridge into the airport terminal.  Our Guest Travel Services Team will also be available for emergency assistance at 1-888-372-9996.  Please note, food and beverage options at the airport will be limited and in-flight meal service will be unavailable on most domestic flights.

Additionally, airport staffing has been minimized as a precaution. Please plan for and expect longer-than-usual wait times for airline check-in and security. As you debark, as well as, in the airport it is important that everyone maintain social distancing standards of 2 meters (6 feet) apart.

We are working to confirm return travel for all guests onboard.  As soon as we receive your new flight arrangements they will be printed and delivered to your stateroom.  All guests must check with their final destination country on specific requirements for self-isolation or quarantine upon arrival.

Throughout the remainder of our journey we will continue to provide you with a full schedule of entertainment, activities and dining options.  Wi-Fi will remain complimentary, as will laundry service, in-stateroom movies and beverage service throughout the ship.

Our Officers and Crew will be available for any assistance you may need. All guests onboard remain healthy and happy, and we will do everything we can to keep it that way on the remainder of our journey home.

Sincerely,
Captain Leonardos Palaiokrassas
Master
Celebrity Eclipse

---

[15]   *See*   https://www.10news.com/news/coronavirus/family-of-infected-passenger-on-celebrity-eclipse-says-coronavirus-symptoms-began-showing-at-sea (last accessed May 7, 2020).

aa. <u>March 30, 2020 (*Celebrity Eclipse*)</u> – The *Celebrity Eclipse* docked in San Diego, California. CELEBRITY permitted passengers to disembark and go home, but immediately thereafter, ordered CELEBRITY crew members remaining onboard to quarantine.

bb. <u>April 6, 2020</u> – News reports and other sources reveal that at least two passengers died as a result of contracting COVID-19 aboard the *Celebrity Eclipse*, and approximately 45 others contracted COVID-19 while aboard the vessel.

cc. <u>April 9, 2020</u> – The CDC issued its second No Sail Order.[16]

33.     Based on the foregoing timeline, CELEBRITY knew or should have known of the dangerous conditions and/or explosive contagiousness associated with COVID-19 aboard the vessel as early as February 5, 2020 when it sent an e-mail to prospective passengers recognizing the risk, on February 13, 2020 when the CDC published its *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019* and/or as late as March 26, 2020 when a passenger(s) aboard the vessel complained of symptoms consistent with a COVID-19 diagnosis.

## CLASS ACTION ALLEGATIONS

34.     At all times material hereto, Plaintiffs, the Class Representative and Class Members herein, were passengers aboard Defendant's vessel and who contracted COVID-19 and/or were placed at a heightened risk of exposure to COVID-19 while aboard Defendant's vessel and/or as a result of Defendant's careless conduct alleged herein.

35.     This action is brought by Plaintiffs on their own behalves, and on behalf of all others similarly situated, under the provisions of Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure.

36.     The class so represented by the Plaintiffs in this action, and of which Plaintiffs are members, consists of passengers aboard Defendant's vessel from March 1 to March 30, 2020, who

---

[16] *See* Centers for Disease Control, *April 9, 2020 No Sail Order* https://www.cdc.gov/quarantine/pdf/No-Sail-Order-Cruise-Ships_Extension_4-9-20-encrypted.pdf.

were subjected to the dangerous conditions outlined above in connection with Defendant's unreasonably dangerous and/or lackadaisical response to the COVID-19 pandemic and/or its presence aboard Defendant's vessel, despite having knowledge of such dangerous conditions aboard the subject vessel as early as February 5, 2020 when it sent an e-mail to prospective passengers recognizing the risk, on February 13, 2020 when the CDC published its *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019* and/or as late as March 26, 2020 when a passenger(s) aboard the vessel complained of symptoms consistent with a COVID-19 diagnosis.

37.     This class of passengers contracted COVID-19 and/or were placed at an increased exposure to contracting it and/or suffered medical complications arising from the virus itself and/or suffered a psychological toll as a result of potentially contracting same, and were injured about their bodies and/or extremities, suffered physical pain and suffering, mental anguish, reduced lung function and/or capacity, future physical and medical problems (including but not limited to reduced lung function and/or capacity) and/or the reasonable fear of developing future physical and medical problems as a result of Defendant's negligence and/or gross negligence and/or intentional conduct.

38.     The exact number of members of the class is unknown at this time given that many members are currently in voluntary or forced isolation at this time and/or have been unable to be properly tested for COVID-19 since disembarking the vessel and returning home; however, at this time it is estimated that there are in excess of 1,000 members. The class is so numerous that joinder at this anticipated amount of all members is impracticable. Thus, this action satisfies the requirements of Rule 23(a)(1).

39.     There are common questions of law and fact that relate to and effect the rights of each member of the class and the relief sought is common to the entire class. The same misconduct on

the part of Defendant, CELEBRITY, caused the same or similar injury to each class member. All class members seek damages under U.S. General Maritime Law. Accordingly, this action satisfies the requirement of Rule 23(a)(2).

40.     The claims of Plaintiffs are typical of the claims of the class, in that the claims of all members of the class, including the named Plaintiff, depend upon a virtually identical showing of the acts and omissions of Defendant, CELEBRITY, giving rise to the right of Plaintiff to the relief sought herein. Defendant, CELEBRITY, was at all times material hereto engaged in the same conduct to the detriment of the entire class of Plaintiffs. Accordingly, this action satisfies the requirements of Rule 23(a)(3).

41.     Plaintiffs are the representative parties for the class, and are able to, and will, fairly and adequately protect the interests of the class. There is no conflict between Plaintiffs and other members of the class with respect to this action, or with respect to the claims for relief herein. The attorneys for Plaintiffs are experienced and capable in the field of maritime claims for cruise ship passenger injury, including class actions, and have successfully represented claimants in other litigation of this nearly exact nature. Three of the attorneys designated as counsel for Plaintiffs, Jason R. Margulies, Michael A. Winkleman, and L. Alex Perez, will actively conduct and be responsible for Plaintiffs' case herein. Accordingly, this action satisfies the requirement of Rule 23(a)(4).

42.     This action is properly maintained as a class action under Rule 23(b)(3) inasmuch as questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy. In support of the foregoing, Plaintiffs allege that common issues predominate and can be determined on a class-wide basis regarding

Defendant, CELEBRITY's failure to exercise reasonable care under the circumstances toward the Plaintiffs while aboard the vessel in connection with the presence and/or threat of COVID-19 aboard same, in view of Defendant's careless and/or lackadaisical response to the COVID-19 pandemic and/or its confirmed and/or likely presence aboard Defendant's vessel while Plaintiffs were passengers aboard the vessel.

43.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because it is unlikely that individual plaintiffs would assume the burden and the cost of this complex litigation, and Plaintiffs are not aware of any class members who are interested in individually controlling the prosecution of a separate action. The interests of justice will be served by resolving the common disputes of the class members with Defendant, CELEBRITY, in a single forum, and individual actions by class members, many of whom are citizens of different states would not be cost effective. The class consists of a finite and identifiable number of individuals which will make the matter manageable as a class action.

## <u>COUNT I – GENERAL NEGLIGENCE</u>

Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs one (1) through forty-three (43), as though alleged originally herein, and further allege:

44.     It was the duty of Defendant to provide Plaintiffs and all others similarly situated with reasonable care under the circumstances.

45.     Defendant and/or its agents, servants, and/or employees breached its duty to provide Plaintiffs with reasonable care under the circumstances.

46.     As a result, Plaintiffs were injured due to the fault and/or negligence of Defendant, and/or its agents, servants, and/or employees as follows:

      a.     Failure to use reasonable care to provide and maintain a safe voyage for Plaintiffs and others similarly situated, fit with proper and adequate safety measures,

protection, cleaning products and equipment, especially during a known and escalating global pandemic related to COVID-19;

b.  Failure to adequately examine passengers' and/or crewmembers' health condition on land and before allowing them to board and/or remain aboard the vessel for the subject voyage;

c.  Failure to have adequate medical personnel during the boarding process on land and/or on the vessel before the subject voyage commenced to evaluate and/or determine whether to allow passengers and/or crew members to board the vessel who plainly and/or objectively exhibited symptoms consistent with a positive COVID-19 diagnosis;

d.  Failure to have adequate medical personnel aboard the vessel and/or shoreside responsible for the boarding process of passengers and/or crew members to determine whether to allow boarding to passengers and/or crewmembers in accordance with CDC guidelines available at the time of boarding;[17]

e.  Failure to adequately sanitize and/or disinfect the vessel's common areas and passengers' cabins;

f.  Failure to adequately sanitize and/or disinfect plates, cups, food trays, utensils, ice machines and drinking fountains aboard the vessel to be used by passengers;

g.  Failure to timely quarantine passengers aboard the vessel infected with COVID-19 and/or who exhibited symptoms consistent with a COVID-19 diagnosis and/or other virus and/or other infectious disease;

h.  Failure to timely quarantine crew members aboard the vessel infected with COVID-19 and/or who exhibited symptoms consistent with a COVID-19 diagnosis and/or other virus and/or other infectious disease;

i.  Failure to provide prompt, proper, and adequate medical treatment to passengers infected with COVID-19 and/or who exhibited symptoms consistent with a COVID-19 diagnosis and/or other virus and/or other infectious disease;

j.  Failure to serve food to passengers that wasn't contaminated with COVID-19;

k.  Failing to practice safe and sanitary food practices aboard the vessel;

l.  Failure to adequately and properly eradicate COVID-19 or some other virus causing illness to passengers aboard the vessel;

---

[17] *See* Centers for Disease Control and Prevention, *Interim Guidance for Ships on Managing Suspected Coronavirus Disease 2019*, (last updated February 18, 2020) https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html.

m.  Failure to take adequate steps to prevent an outbreak of COVID-19 and/or virus and/or infectious disease aboard the vessel when Defendant knew or should have known that such an outbreak was going to occur and/or had already occurred aboard the vessel on or about February 5, 2020, February 13, 2020, March 2, 2020 and/or March 26, 2020;

n.  Failure to take adequate medical precautions when a passenger exhibited symptoms of COVID-19 aboard the vessel so that it could be timely diagnosed and/or managed in relation to other passengers aboard the vessel who could and/or likely would contract same;

o.  Failure to perform available testing on all ill passengers aboard the vessel to confirm the type and nature of their illness in order to rule out COVID-19;

p.  Failure to have adequate policies and procedures in place to manage and/or contain the outbreak and/or spread of COVID-19 aboard the vessel;

q.  Failure to provide a sanitary vessel to prevent an outbreak of COVID-19 aboard same, including, but not limited to, the performance of adequate and/or effective cleaning/sanitary procedures and/or supplying the vessel with a sufficient amount of cleaning equipment and supplies;

r.  Refusing to cancel and/or offer refunds to passengers as a result of a passenger and/or crew member(s) on a prior cruise aboard the vessel who may have exhibited symptoms consistent with a COVID-19 diagnosis;

s.  Failing to have proper policies and procedures in place to determine whether to offer refunds as a result of the risk of exposing passengers to COVID-19;

t.  Failure to provide adequate training, instruction, and supervision to Defendant's crew members as it pertained to properly handling the growing COVID-19 pandemic and its relation and/or threat aboard the vessel;

u.  Failure to promulgate and/or enforce adequate policies and procedures to ensure that safety aboard the vessel in response to the threat of COVID-19 would not be compromised for Defendant's cost and/or profits;

v.  Failure to promulgate policies and/or procedures aimed at ensuring an adequate emergency plan to protect the health and welfare of passengers during an outbreak of a virus and/or infectious disease, including, but not limited to, COVID-19;

w.  Failure to determine and/or appreciate the hazards associated with allowing passengers to congregate within close distances, including within six feet, in common areas of the vessel;

x.  Knowing, as a result of previous similar infectious disease outbreaks aboard

Defendant's vessels, of the likelihood of a threat to passenger safety resulting from COVID-19 as outlined above; yet, failing to take corrective action and/or implement policies and procedures aimed at preventing and/or mitigating the harmful effects of the of the subject incident/COVID-19 outbreak aboard the vessel;

y. Failure to amend its cancellation policy to allow passengers to cancel the subject cruise without financial penalty in light of a passenger from a previous voyage who may have exhibited symptoms consistent with a positive COVID-19 diagnosis and/or the significant actual risk due to COVID-19 global pandemic worldwide;

z. Continuing to allow passengers to congregate in close proximity to one another and/or eat in buffet settings aboard the vessel (*i.e.* not enforcing physical distancing measures) and/or providing passengers with "a full schedule of entertainment, activities and dining options" as late as March 28, 2020, despite Defendant knowing of the presence and/or likely presence of COVID-19 aboard the vessel as early as February 5, 2020 when it sent an e-mail to prospective passengers recognizing the risk, on February 13, 2020 when the CDC issued considerations to cruise ship operators as it pertained to the potential spread of COVID-19 aboard cruise vessels and/or as late as March 2 and/or 26, 2020 when a passenger aboard the vessel complained of symptoms consistent with a positive COVID-19 diagnosis;

aa. Failure to reasonably restrict individuals' access to the vessel (including, but not limited to CELEBRITY's passengers, shoreside personnel, independent contractors, crewmembers, etc.) once CELEBRITY acquired notice of the dangerous conditions and/or explosive contagiousness associated with COVID-19 potentially aboard the vessel;

bb. Failure to timely enact fleetwide vessel lockdowns of all non-essential personnel once CELEBRITY acquired notice of the dangerous conditions and/or explosive contagiousness associated with COVID-19 potentially aboard its other vessels;

cc. Failure to timely enact fleetwide and/or specific vessel physical distancing measures, including, but not limited to, a requirement that all shipboard individuals maintain separation of at least six (6) feet from other passengers and/or crew;

dd. Failure to timely quarantine those passenger and/or crew members whom Defendant reasonably suspected had contracted COVID-19 aboard the vessel and/or other vessels operated by Defendant;

ee. Failure to reasonably and/or timely identify passengers and/or crew members who recently traveled to or from COVID-19 high risk/exposure locations before permitting them to board the vessel; and/or

ff. Other acts or omissions constituting a breach of the duty to use reasonable care under the circumstances which are revealed through discovery.

47.     The above acts and/or omissions caused and/or contributed to Plaintiffs and others similarly situated contracting COVID-19 and/or medical complications arising from it because the Plaintiffs and others similarly situated would not have contracted COVID-19 and/or been unreasonably exposed to contracting same had Defendant exercised reasonable care under the circumstances.

48.     The above acts and/or omissions caused and/or contributed to the Plaintiffs and others similarly situated contracting COVID-19 and/or medical complications arising from it because the COVID-19 outbreak aboard the vessel would not have occurred but for Defendant's failure to adequately sanitize the vessel in a reasonably safe condition.

49.     Defendant knew of the foregoing conditions causing Plaintiffs and others similarly situated to contract COVID-19 and/or be exposed to an actual risk of physical injury resulting from it and did not correct them, or the conditions existed for a sufficient length of time so that Defendant in the exercise of reasonable care under the circumstances should have learned of them and corrected them.

50.     As a result of Defendant's negligence, Plaintiffs and others similarly situated:

    a.   Contracted COVID-19 and/or suffered medical complications arising from it and were injured about their body and extremities, suffered both physical pain and suffering, mental and emotional anguish, loss of enjoyment of life, temporary and/or permanent physical disability, impairment, inconvenience in the normal pursuits and pleasures of life, feelings of economic insecurity, disfigurement, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of their injuries including life care, suffered physical handicap, lost wages, income lost in the past, and their working ability and earning capacity has been impaired. The injuries and damages are permanent or continuing in nature, and Plaintiffs and others similarly situated will suffer the losses and impairments in the future; and/or

    b.   Were exposed to an actual risk of the physical injury, which caused severe mental and emotional anguish with physical manifestations of that mental and emotional anguish including, but not limited to, sickness, nausea, exhaustion, fatigue, headaches, insomnia, lack of sleep, poor sleep, nightmares and/or respiratory

LIPCON, MARGULIES, ALSINA & WINKLEMAN, P.A.
WWW.LIPCON.COM

difficulties.

**WHEREFORE**, the Plaintiffs and others similarly situated demand judgment for all damages recoverable under the law against the Defendant, and demand trial by jury.

## COUNT II – NEGLIGENT FAILURE TO WARN

Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs one (1) through forty-three (43), as though alleged originally herein, and further allege:

51.     It was the duty of Defendant to provide Plaintiffs and all others similarly situated with reasonable care under the circumstances.

52.     Additionally, Defendant was under a duty to warn Plaintiffs of dangerous conditions aboard the ship and/or in specific areas where Defendant invited Plaintiffs to occupy and/or reasonably foresaw that Plaintiffs would occupy aboard the vessel, such as common areas and/or the dining rooms.

53.     At all times material, the presence of COVID-19 aboard the vessel constituted a dangerous condition, of which Defendant had prior knowledge and/or acquired such knowledge during the subject cruise, for the reasons outlined above.

54.     Defendant and/or its agents, servants, and/or employees breached its duty to provide Plaintiffs with reasonable care under the circumstances and/or its duty to warn Plaintiffs of the dangerous conditions associated with COVID-19 aboard the vessel.

55.     As a result, Plaintiffs were injured due to the fault and/or negligence of Defendant, and/or its agents, servants, and/or employees as follows:

     a.   Failure to adequately and/or timely warn passengers of other passengers and/or crew who complained to Defendant and/or the medical professionals aboard the vessel that they had symptoms consistent with a positive COVID-19 diagnosis;

     b.   Misrepresenting to passengers aboard the vessel that "[a]ll guests onboard remain healthy and happy" and/or misrepresenting that no person onboard had COVID-19;

LIPCON, MARGULIES, ALSINA & WINKLEMAN, P.A.
WWW.LIPCON.COM

when in fact, a person aboard the vessel complained of symptoms consistent with COVID-19 and later tested positive and/or Defendant could not reasonably test the person to confirm their diagnosis and reliably advise other passengers about whether or not there was an absence of COVID-19 cases aboard the vessel;

    c.   Failure to adequately and/or timely warn passengers of the dangers and/or risks of contracting COVID-19, including, but not limited to, failing to reasonably inform the passengers of the extent of a potential COVID-19 outbreak aboard the vessel and/or how to reduce the likelihood of contracting infectious disease, including COVID-19 specifically, aboard the vessel;

    d.   Failure to adequately and/or timely warn passengers before boarding the vessel that a passenger on a prior cruise may have shown symptoms of COVID-19;

    e.   Failure to adequately and/or timely warn passengers before boarding the vessel that the vessel's medical facility, including the medical personnel, equipment, and supplies, would not be able to adequately handle a COVID-19 outbreak onboard the vessel;

    f.   Other acts or omissions constituting a breach of the duty to use reasonable care under the circumstances which are revealed through discovery.

56.    The above acts and/or omissions caused and/or contributed to Plaintiffs and others similarly situated contracting COVID-19 and/or medical complications arising from it because the Plaintiffs and others similarly situated would not have contracted COVID-19 and/or been unreasonably exposed to contracting same had Defendant exercised reasonable care under the circumstances and/or warned the Plaintiffs, as outlined above.

57.    The above acts and/or omissions caused and/or contributed to Plaintiffs and others similarly situated contracting COVID-19 and/or medical complications arising from it because the Plaintiffs and others similarly situated would not have participated in the subject cruise to the extent that they did, based on and/or in part on the Captain's assurances, and/or had Defendant adequately warned the Plaintiffs of the foreseeable danger pertaining to the COVID-19 outbreak aboard the vessel.

LIPCON, MARGULIES, ALSINA & WINKLEMAN, P.A.
WWW.LIPCON.COM

58.     Defendant knew of the foregoing conditions causing Plaintiffs and others similarly situated to contract COVID-19 and/or be exposed to an actual risk of physical injury resulting from it and did not correct them, or the conditions existed for a sufficient length of time so that Defendant in the exercise of reasonable care under the circumstances should have learned of them and corrected them.

59.     As a result of Defendant's negligence, Plaintiffs and others similarly situated:

a.   Contracted COVID-19 and/or suffered medical complications arising from it and were injured about their body and extremities, suffered both physical pain and suffering, mental and emotional anguish, loss of enjoyment of life, temporary and/or permanent physical disability, impairment, inconvenience in the normal pursuits and pleasures of life, feelings of economic insecurity, disfigurement, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of their injuries including life care, suffered physical handicap, lost wages, income lost in the past, and their working ability and earning capacity has been impaired. The injuries and damages are permanent or continuing in nature, and Plaintiffs and others similarly situated will suffer the losses and impairments in the future; and/or

b.   Were exposed to an actual risk of the physical injury, which caused severe mental and emotional anguish with physical manifestations of that mental and emotional anguish including, but not limited to, sickness, nausea, exhaustion, fatigue, headaches, insomnia, lack of sleep, poor sleep, nightmares and/or respiratory difficulties.

**WHEREFORE**, the Plaintiffs and others similarly situated demand judgment for all damages recoverable under the law against the Defendant, and demand trial by jury.

## <u>COUNT III – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>

Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs one (1) through forty-three (43), as though alleged originally herein, and further allege:

60.     It was the duty of Defendant to provide Plaintiffs and all others similarly situated with reasonable care under the circumstances.

61.     At all times material, due to the negligence and/or gross negligence and/or intentional

conduct of the Defendant, outlined above, Plaintiffs and all others similarly situated were placed in an immediate risk of physical harm. Said risk of physical harm included, but is not limited to: contracting COVID-19 and/or medical complications arising from it and/or injury and/or death and/or severe emotional and/or psychological trauma.

62.     Defendant's negligence and/or gross negligence and/or intentional conduct caused mental and/or emotional harm and/or distress in the Plaintiffs and all others similarly situated, such as fear and anxiety. These emotional injuries and/or damages have also resulted in physical manifestations, such as sickness, nausea, exhaustion, fatigue, headaches, insomnia, lack of sleep, poor sleep, nightmares and/or respiratory difficulties.

63.     More specifically, Defendant caused Plaintiffs to be placed in a foreseeable zone of risk of immediate physical impact because Defendant knew of the risks and/or dangers in connection with COVID-19, its presence and/or likely presence aboard the vessel during the subject voyage, as well as the injuries it could cause Plaintiffs and/or other passengers if they physically contracted it; yet, as outlined above, Defendant carelessly failed to reasonably protect and/or warn the Plaintiffs of those risks and/or dangers. As a result, Plaintiffs were placed in a foreseeable zone of risk of immediate physical impact (*i.e.* physically contracting COVID-19 from other passengers and/or crew members while aboard the vessel and/or disembarking same) as a result of Defendant's failure to timely and/or reasonably curtail Plaintiffs and/or other passengers and/or other crew members activities and/or conduct while aboard the vessel.

64.     For example, Defendant continued to allow passengers to congregate in close proximity to one another and/or eat in buffet settings aboard the vessel (*i.e.* not enforcing physical distancing measures) and/or provide passengers with "a full schedule of entertainment, activities and dining options" as late as March 28, 2020, despite Defendant knowing of the presence and/or likely

presence of COVID-19 aboard the vessel as early as February 5, 2020 when it sent an e-mail to prospective passengers recognizing the risk, on February 13, 2020 when the CDC issued considerations to cruise ship operators as it pertained to the potential spread of COVID-19 aboard cruise vessels and/or as late as March 2 and/or 26, 2020 when a passenger aboard the vessel complained of symptoms consistent with a positive COVID-19 diagnosis.

65.    In sum, Plaintiffs and those similarly situated were forced to remain on the vessel that had a passenger(s) present to Defendant with symptoms consistent with a positive COVID-19 diagnosis, and then were forced to disembark the vessel in tight groups, which further created an immediate and actual risk to Plaintiffs of physical exposure to COVID-19 and/or a reasonable fear of great bodily harm and/or death as a result of contracting same.

66.    As a result of Defendant's negligence, Plaintiffs and others similarly situated:

     a.  Contracted COVID-19 and/or suffered medical complications arising from it and were injured about their body and extremities, suffered both physical pain and suffering, mental and emotional anguish, loss of enjoyment of life, temporary and/or permanent physical disability, impairment, inconvenience in the normal pursuits and pleasures of life, feelings of economic insecurity, disfigurement, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of their injuries including life care, suffered physical handicap, lost wages, income lost in the past, and their working ability and earning capacity has been impaired. The injuries and damages are permanent or continuing in nature, and Plaintiffs and others similarly situated will suffer the losses and impairments in the future; and/or

     b.  Were exposed to an actual risk of the physical injury, which caused mental and emotional anguish with physical manifestations of that mental and emotional anguish including, but not limited to, sickness, nausea, exhaustion, fatigue, headaches, insomnia, lack of sleep, poor sleep, nightmares and/or respiratory difficulties.

**WHEREFORE**, the Plaintiffs and others similarly situated demand judgment for all damages recoverable under the law against the Defendant, and demand trial by jury.

## COUNT IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiffs re-allege, adopt, and incorporate by reference the allegations in paragraphs one (1) through forty-three (43), as though alleged originally herein, and further allege:

67.    As set forth above, Defendant's actions and/or omissions in responding to the COVID-19 outbreak aboard the vessel was intentional and/or reckless, and, as a result, inflicted severe mental suffering on the Plaintiffs herein.

68.    Evidence of Defendant's intentional/reckless and outrageous conduct before and during the subject voyage is outlined below:

   a.   Failing to timely and/or adequately screen passengers on land before allowing them to board the vessel for the subject voyage, despite Defendant knowing of the escalating COVID-19 pandemic and the potential for an explosive COVID-19 outbreak aboard the vessel, in view of the *Diamond Princess* and *Grand Princess* crises several weeks earlier, so that Defendant could claim plausible deniability as to their knowledge of COVID-19 aboard the subject vessel if/when it actually occurred;

   b.   Deciding to proceed with the subject voyage and not restricting passengers' activities aboard the vessel despite a passenger(s) complaining of symptoms consistent with a positive COVID-19 diagnosis while aboard the vessel;

   c.   Failing to timely restrict passengers' buffet/group dining aboard the vessel, quarantine passengers and/or crew and/or enact physical distance requirements aboard the vessel, despite acknowledging the "escalation of this unprecedent situation" related to the COVID-19 pandemic; and instead, continuing to allow passengers and/or crew to congregate in close proximity to one another aboard the vessel for meals and/or entertainment; and/or

   d.   Failing to timely and/or reasonably warn passengers of the potential presence of COVID-19 aboard the vessel in view of a passenger(s)'s complaint(s) of symptoms consistent with a positive COVID-19 diagnosis; and instead, attempting to pacify passengers in the midst of the COVID-19 outbreak aboard the vessel by offering them complimentary alcoholic beverages and otherwise downplaying the severity of the COVID-19 outbreak that was ravaging the vessel, its passengers and crew during the subject voyage.

69.    At all times material, due to the negligence and/or gross negligence/reckless and/or intentional conduct of the Defendant, Plaintiffs and all others similarly situated were placed in an

immediate risk of physical harm. Said risk of physical harm included but is not limited to: contracting COVID-19 and/or medical complications arising from it and/or injury and/or death and/or severe emotional and/or psychological trauma.

70.    More specifically, Defendant caused Plaintiffs to be placed in a foreseeable zone of risk of immediate physical impact because Defendant knew of the risks and/or dangers in connection with COVID-19, its presence and/or likely presence aboard the vessel during the subject voyage, as well as the injuries it could cause Plaintiffs and/or other passengers; yet, as outlined above, Defendant carelessly failed to reasonably protect and/or warn the Plaintiffs of those risks and/or dangers. As a result, Plaintiffs were placed in a foreseeable zone of risk of immediate physical impact (*i.e.* contracting COVID-19 while aboard the vessel and/or disembarking same) as a result of Defendant's failure to timely and/or reasonably curtail Plaintiffs and/or other passengers and/or other crew members activities and/or conduct while aboard the vessel.

71.    Plaintiffs' emotional injuries and/or damages have also resulted in severe physical manifestations, such as severe sickness, nausea, exhaustion, fatigue, headaches, insomnia, lack of sleep, poor sleep, nightmares and/or respiratory difficulties.

72.    Defendant's conduct, as alleged and outlined above, was so outrageous in character, and so extreme in degree, that it goes beyond all possible bounds of common decency, and can be regarded as atrocious and utterly intolerable in a civilized community.

73.    As a result of Defendant's intentional conduct, Plaintiffs and others similarly situated:

     a.    Contracted COVID-19 and/or suffered medical complications arising from it and were injured about their body and extremities, suffered both physical pain and suffering, mental and emotional anguish, loss of enjoyment of life, temporary and/or permanent physical disability, impairment, inconvenience in the normal pursuits and pleasures of life, feelings of economic insecurity, disfigurement, aggravation of any previously existing conditions therefrom, incurred medical expenses in the care and treatment of their injuries including life care, suffered physical handicap, lost wages, income lost in the past, and their working ability and

earning capacity has been impaired. The injuries and damages are permanent or continuing in nature, and Plaintiffs and others similarly situated will suffer the losses and impairments in the future; and/or

b. Were exposed to an actual risk of the physical injury, which caused severe mental and emotional anguish with severe physical manifestations of that mental and emotional anguish including, but not limited to, severe sickness, nausea, exhaustion, fatigue, headaches, insomnia, lack of sleep, poor sleep, nightmares and/or respiratory difficulties.

**WHEREFORE**, the Plaintiffs and others similarly situated demand judgment for all damages recoverable under the law against the Defendant, and demand trial by jury.

Dated: May 13, 2020                                       Respectfully submitted,

                                                          LIPCON, MARGULIES,
                                                          ALSINA & WINKLEMAN, P.A.
                                                          *Attorneys for Plaintiffs*
                                                          One Biscayne Tower, Suite 1776
                                                          2 South Biscayne Boulevard
                                                          Miami, Florida 33131
                                                          Telephone No.: (305) 373-3016
                                                          Facsimile No.: (305) 373-6204

                                                   By:    */s/ Michael Winkleman*
                                                          **JASON R. MARGULIES**
                                                          Florida Bar No. 57916
                                                          jmargulies@lipcon.com
                                                          **MICHAEL A. WINKLEMAN**
                                                          Florida Bar No. 36719
                                                          mwinkleman@lipcon.com
                                                          **JACQUELINE GARCELL**
                                                          Florida Bar No. 104358
                                                          jgarcell@lipcon.com
                                                          **L. ALEX PEREZ**
                                                          Florida Bar No. 125452
                                                          aperez@lipcon.com